626 F.2d 966

**FEDERAL TRADE COMMISSION**

v.

**OWENS–CORNING FIBERGLAS CORPORATION et al., Appellants,**

v.

**Michael PERTSCHUK et al.**

**FEDERAL TRADE COMMISSION, Appellant,**

v.

**OWENS–CORNING FIBERGLAS CORPORATION et al.**

Nos. 79–1167, 79–1443.

United States Court of Appeals, District of Columbia Circuit.

Argued Dec. 11, 1979.

Decided March 13, 1980.

were on the brief, for appellants in No. 79–1167 and appellees in No. 79–1443.

Warren S. Grimes, Atty., F. T. C., Washington, D. C., with whom Michael N. Sohn, Gen. Counsel, and Leslie Rice Melman, Atty., F. T. C., Washington, D. C., were on the brief, for appellee in No. 79–1167 and cross-appellant in No. 79–1443.

Before TAMM and WALD, Circuit Judges, and HAROLD H. GREENE,* U. S. District Judge for the District of Columbia.

Opinion for the court filed by Circuit Judge TAMM.

Opinion concurring in part and dissenting in part filed by Circuit Judge WALD.

TAMM, Circuit Judge:

This case comes before us on cross-appeals from an order of the United States District Court for the District of Columbia that enforced, subject to certain conditions, three subpoenas duces tecum issued by the Federal Trade Commission. The appellants, respondents in the enforcement action, seek further protections against public disclosure of trade secrets that they assert appear in the documents under subpoena. The Commission disagrees and, in addition, argues that the district court exceeded its authority by attaching conditions to the subpoenas beyond those appearing in the Commission's original orders. We conclude that the issues presented by the appellant are either meritless or not yet ripe for review and that the protective conditions added by the district court are unwarranted. We therefore affirm the order insofar as it enforces the subpoenas as issued, and we vacate those portions of the order that impose further restrictions.

## I.  BACKGROUND

The facts in this case are straightforward. As part of a nonpublic antitrust investigation of the insulation industry, the Commission staff in July of 1977 issued virtually identical subpoenas duces tecum to

Richard M. Rindler, Washington, D. C., with whom Gilbert E. Geldon, Daniel J. Plaine, Alan S. Ward, John Lewis Smith, III, and Shirley Johnson, Washington, D. C.,

* Sitting by designation pursuant to 28 U.S.C. § 292(a) (1976).

Owens-Corning Fiberglas Corporation, Johns-Manville Corporation, and Certain-Teed Corporation, the appellants herein. The subpoenas asked for various documents containing technical, business, and financial information about the three companies. After meetings with members of the Commission staff produced mutually satisfactory modifications, the appellants submitted nonconfidential documents to the Commission. They refused, however, to turn over certain other documents that they claimed contain trade secrets.[1]

The Commission agreed to afford the withheld documents confidential treatment under its customary procedures for handling such information.[2] Specifically, it committed itself to giving the company that submitted a document ten days' notice before disclosing its contents to anyone outside the Commission. The Commission nevertheless excepted from this procedure official requests from courts or arms of Congress. In these instances, it promised "ten days' prior notice where possible, and

in any event as much notice as can reasonably be given." Joint Appendix (J.A.) at 233, 237, 311, 315 (letters from the Commission staff to appellants' counsel). Subsequently, the appellants tendered additional documents, but they still refused to surrender the rest without further assurances of confidentiality.

On October 23, 1978, the Commission filed a petition in the district court for an order to enforce the subpoenas under section 9 of the Federal Trade Commission Act (FTC Act), 15 U.S.C. § 49 (1976). The appellants, respondents in the district court, filed substantially identical counterclaims asking for a declaration that the documents contain trade secrets within the meaning of the Trade Secrets Act, 18 U.S.C. § 1905 (1976),[3] and section 6(f) of the FTC Act, 15 U.S.C. § 46(f) (1976),[4] and that the documents are exempt from release under the Freedom of Information Act (FOIA), 5 U.S.C. § 552 (1976). They also sought a protective order that would provide additional guarantees of confidentiality.[5]

1. Specifically, the appellants contend that the documents contain detailed information concerning costs, sales, profits, customers, markets, business plans and strategies, plants and equipment, research and development, and new and secret processes.

2. The Commission's general procedures regarding confidentiality and access appear in the FTC Operating Manual, ch. 15, *reprinted in* Joint Appendix (J.A.) at 715–42.

3. This statute provides:
   Whoever, being an officer or employee of the United States or of any department or agency thereof, publishes, divulges, discloses, or makes known in any manner or to any extent not authorized by law any information coming to him in the course of his employment or official duties or by reason of any examination or investigation made by, or return, report or record made to or filed with, such department or agency or officer or employee thereof, which information concerns or relates to the trade secrets, processes, operations, style of work, or apparatus, or to the identity, confidential statistical data, amount or source of any income, profits, losses, or expenditures of any person, firm, partnership, corporation, or association; or permits any income return or copy thereof or any book containing any abstract or particulars thereof to be seen or examined by any

person except as provided by law; shall be fined not more than $1,000, or imprisoned not more than one year, or both; and shall be removed from office or employment.
18 U.S.C. § 1905 (1976).

4. This section provides in relevant part that the Commission shall have the power "[t]o make public from time to time such portions of the information obtained by it hereunder, *except trade secrets and names of customers*, as it shall deem expedient in the public interest . . . ." FTC Act § 6(f), 15 U.S.C. § 46(f) (1976) (emphasis added).

5. In particular, the appellants asked the district court to enter an order compelling the Commission (1) not to disclose the documents to persons outside the Commission except pursuant to a formally authorized request from Congress or compulsory process from a court, (2) to notify the appellants immediately in case of such a request, (3) to inform any congressional requestor that the documents contain trade secrets the Commission is prohibited from disclosing publicly, (4) to seek from any judicial requestor in camera treatment of any documents surrendered, and (5) to return the documents, together with all copies, notes, abstracts, or other working materials, to the appellants within 30 days of the conclusion of the investigation or any resulting litigation.

On January 31, 1979, the court entered an order dismissing the counterclaims and enforcing the subpoenas subject to the Commission's promised procedures regarding confidentiality, with two additions. First, the order requires the Commission in the case of a congressional or a judicial request "immediately, forthwith upon receipt by it of such a request, [to] advise the respondent which had furnished the document, by telephone and by a written communication, that the request has been made and indicate the nature and extent of the request." *FTC v. Owens-Corning Fiberglas Corp.*, Misc. No. 78–313, at 2 (D.D.C. Jan. 31, 1979) (order enforcing subpoenas), *reprinted in* J.A. at 11, 12. Second, in the case of congressional requests the order obliges the Commission to "verif[y] that the request is made in accordance with the controlling congressional rule, and [to advise] the requestor that the respondent has claimed that the document contains confidential trade secrets." *Id.* This order is now before us on cross-appeals, the appellants contending that the district court did not go far enough and the Commission that it went too far.

## II. COMMISSION DISCLOSURE OF CONFIDENTIAL INFORMATION

Before embarking on an analysis of the particular arguments raised by the parties, we believe it useful to recapitulate in general terms the law governing Commission disclosure of information contained in confidential documents it has obtained under subpoena. Specifically, appellants are troubled by requests from two sources, Congress and the general public.[6] We therefore shall review the Commission's formal release of secret information to these groups, either voluntarily or pursuant to some request that by law it must grant.

### A. *Congressional Requests*

Recently this court has had several occasions to discuss congressional requests for confidential documents in the hands of the Commission. In particular, we have held explicitly that the Commission may not deny Congress access to confidential documents, including those that contain trade secrets. *E. g., Exxon Corp. v. FTC*, 589 F.2d 582, 585–86 (D.C. Cir. 1978), *cert. denied*, 441 U.S. 943, 99 S.Ct. 2160, 60 L.Ed.2d 1044 (1979); *Ashland Oil, Inc. v. FTC*, 548 F.2d 977, 979 (D.C. Cir. 1976). Release to a congressional requestor is not a public disclosure forbidden by section 6(f) of the FTC Act. *Exxon Corp. v. FTC*, 589 F.2d at 589; *Ashland Oil, Inc. v. FTC*, 548 F.2d at 979. Moreover, courts may not require the Commission to delay surrendering documents to Congress to notify affected parties in advance, for the judiciary must refrain from slowing or otherwise interfering with the legitimate investigatory functions of Congress. *FTC v. Anderson*, No. 78–1032 (D.C.Cir. Sept. 17, 1979); *Exxon Corp. v. FTC*, 589 F.2d at 588–89. Once documents are in congressional hands, "courts must presume that the committees of Congress will exercise their powers responsibly and with due regard for the rights of affected parties." *Id.* at 589 (citing *Ashland Oil, Inc. v. FTC*, 548 F.2d at 979).[7] A court may not block disclosure of information in Congress's possession, at least when the disclosure would serve a valid legislative purpose. *Doe v. McMillan*, 412 U.S. 306, 93 S.Ct. 2018, 36 L.Ed.2d 912 (1973) (construing the speech and debate clause, U.S.Const. art. I, § 6, cl. 1).[8]

### B. *Public Requests Under the FOIA*

Members of the public also may obtain information from agency "records"

---

**6.** Appellants do not appear concerned with thefts or "leaks" from the Commission. We note that any officer or employee of the Commission who releases information without authorization may be fined up to $5,000 and imprisoned up to one year. FTC Act § 10, 15 U.S.C. § 50 (1976).

**7.** Language in some cases indicates that courts may be able to order an agency not to deliver documents when it is "evident" that the con-

gressional requestor intends to divulge trade secrets without good cause. *See Exxon Corp. v. FTC*, 589 F.2d at 589; *Ashland Oil, Inc. v. FTC*, 548 F.2d at 979.

**8.** The Supreme Court in *McMillan* held that members of Congress and their staffs were absolutely immune from civil liability for circulating among persons involved in the legislative process confidential information on the performance of identified children in the District

under the Freedom of Information Act. *See* 5 U.S.C. § 552(a)(3) (1976).[9] An agency must release the material sought unless it falls within an exemption found in the statute. *See id.* § 552(b)–(c). The fourth such exemption permits an agency to withhold "trade secrets and commercial or financial information obtained from a person and privileged or confidential. . . ." *Id.* § 552(b)(4). The exceptions listed in the FOIA do not prohibit an agency from releasing material sought; they only allow the agency to deny access. *Chrysler Corp. v. Brown,* 441 U.S. 281, 293, 99 S.Ct. 1705, 1713, 60 L.Ed.2d 208 (1979). Nevertheless, the Trade Secrets Act[10] expressly forbids an agency to release trade secrets or other confidential information in its possession, except as authorized by law. *See id.* at 290–94, 99 S.Ct. at 1712–14.

■ Upon receiving a request for a document in its possession, the agency itself decides in the first instance whether it includes trade secrets or other confidential information. If the agency concludes that the document is not confidential, it must release the information. The party that

submitted the document, however, may challenge in court the agency's evaluation and decision to release as "agency action . . . not in accordance with law" under 5 U.S.C. § 706(2)(A) (1976), because release of protected information would violate the Trade Secrets Act. *Chrysler Corp. v. Brown,* 441 U.S. at 318, 99 S.Ct. at 1726.[11] On the other hand, if the agency believes it should withhold the document as confidential, the public requestor may file an action in a federal district court to compel its disclosure under 5 U.S.C. § 552(a)(4) (1976). Thus, no matter what conclusion the agency reaches concerning the confidential status of the information, the losing party may seek judicial review of this decision.

## III. PRESENT DETERMINATION OF THE DOCUMENTS' STATUS AS TRADE SECRETS

■ The appellants argue first that we should require the Commission to determine now, in advance of any request for information, whether the documents contain any trade secrets. The appellants believe that such a determination would carry more

---

of Columbia school system. 412 U.S. at 312, 93 S.Ct. at 2024. Nevertheless, the Court also held that the children could recover damages from government officials who executed Congress's order to publish this information to the general public. *Id.* at 315–16, 93 S.Ct. at 2026. The Court reasoned that the speech and debate clause protects only acts taken in furtherance of legislative functions. Dissemination of information to members of Congress and their aides, even if accessible by the press and the public, is part of the lawmaking process; general, public distribution of information beyond Congress and its functionaries serves no legitimate legislative purpose and thus receives no constitutional protection. *Id.* at 317, 324, 93 S.Ct. at 2027, 2030. *Cf. Hutchinson v. Proxmire,* 443 U.S. 111, 99 S.Ct. 2675, 61 L.Ed.2d 411 (1979) (members of Congress not immune from libel actions based on statements in newsletters and press releases).

**9.** This section provides that "each agency, upon any request for records which (A) reasonably describes such records and (B) is made in accordance with published rules stating the time, place, fees (if any), and procedures to be followed, shall make the records promptly available to any person." 5 U.S.C. § 552(a)(3) (1976). The FOIA does not define what constitutes an agency "record," *Forsham v. Harris,*

445 U.S. 169, 100 S.Ct. 978, 979, 63 L.Ed.2d 293 (1980), but "an agency must first either create or obtain a record as a prerequisite to it becoming an 'agency record' within the meaning of the FOIA." *Id.* 445 U.S. at 170, 100 S.Ct. at 979. The usual test for a document not originated in the agency looks to "whether under all the facts of the case the document has passed from the control of [its originator] and become property subject to the free disposition of the agency with which the document resides." *Goland v. CIA,* 607 F.2d 339, 347 (D.C. Cir. 1978), *cert. denied,* 445 U.S. 927, 100 S.Ct. 1312, 63 L.Ed.2d 759 (1980). *Accord, Ryan v. Department of Justice,* 617 F.2d 781 at 785 (D.C. Cir. 1980).

**10.** For text, see note 3 *supra.*

**11.** Because the Trade Secrets Act forbids disclosure only to the "extent not authorized by law," 18 U.S.C. § 1905 (1976), one can argue that releasing any information other than trade secrets or the names of customers is permissible: § 6(f) expressly authorizes release of all information outside these two categories. *See* note 4 *supra.* We intimate no view on this issue.

weight with members of Congress and their staffs and thus would deter release once in congressional hands. Even assuming this hypothesis is true, it does not follow that the Commission must give its advice to Congress. Courts do not render advisory opinions, and we see no reason to require an agency to do so. The Commission has promised to notify the affected appellant of any congressional request, in advance of the documents' transfer when possible, and to inform the recipient that the appellant regards the information as confidential and needing protection. Thus, the appellants will be able to seek confidential treatment from the requestor itself usually before it receives the information but in any event soon thereafter. In the meantime, we must assume that arms of Congress will act discreetly, with due regard for the documents' sensitive nature. *See* p. 970 *supra.*[12]

## IV. RIPENESS

■ The appellants also present several arguments concerning the documents' status as trade secrets or Commission "records" and the Commission's treatment of them at the end of its investigation. Specifically, the appellants ask us to order the Commission to return the documents upon completion of its investigation or any subse-

quent litigation, to hold that the Commission's definitions of "trade secrets" is too narrow, and to declare that the documents are not Commission "records" under the FOIA. The Commission counters that these claims are not yet ripe for review. In evaluating arguments of ripeness, we must ask whether the issues have been presented in a form appropriate for judicial resolution and what hardships the parties would face by a delay in consideration of their claims. *Abbott Laboratories v. Gardner*, 387 U.S. 136, 149, 87 S.Ct. 1507, 1515, 18 L.Ed.2d 681 (1967); *Gardner v. Toilet Goods Association*, 387 U.S. 158, 162, 87 S.Ct. 1520, 1523, 18 L.Ed.2d 697 (1967). Applying this analysis to the questions raised by the appellants, we conclude that they are not yet ripe for our consideration.

■ We may dismiss quickly the appellants' contention that, at the present time, we should order the Commission to return the documents at the end of its investigation. An order compelling return would become appropriate only if the Commission were to withhold the documents unlawfully at some point in the future. The Commission has listed several situations in which it might have legitimate reasons to retain the documents beyond the completion of its in-

---

12. The appellants also argue that in the absence of a determination now by the Commission they are deprived of property without due process of law. This argument is devoid of any merit. First, if the request comes from Congress, surrendering the information is not a public disclosure and thus not a taking of property. *Exxon Corp. v. FTC*, 589 F.2d at 589. Second, if a member of the public requests information from the documents under the FOIA, the Commission has indicated, both in its brief, *see* Brief of Commission at 22, and at oral argument, that its standard practice is to deny the request as falling under the exemption for confidential information. Any deviation from that practice may be challenged at that time.

The appellants try to salvage this argument by asserting that the increased possibility of disclosure caused simply by the documents' leaving their exclusive control reduces the value of the information as trade secrets and thus amounts to a present taking. We do not agree. The appellants have demonstrated no interference with their ability to use their trade se-

crets; they have presented only self-serving speculation that the subpoenas reduce their present market value. This scenario, featuring as it does only a hypothetical disclosure, falls far short of what the Constitution requires to demonstrate a taking. *See generally Penn. Cent. Transp. Co. v. New York City*, 438 U.S. 104, 98 S.Ct. 2646, 57 L.Ed.2d 631 (1978).

Appellants also assert that a present determination is necessary to permit judicial review before they are deprived of their property. In the first place, if surrendering the documents to the Commission does not amount to a taking, there is no due process right to judicial review. As we already have noted, the appellants will have adequate opportunity to attack any disclosure made under the FOIA, and courts can do little to prevent the transfer of documents to congressional hands or to protect them once there. Moreover, asking us to command a Commission determination simply to permit us to review it not only is circular but also in effect would have us lay the foundation for rendering an advisory opinion ourselves should the Commission's ruling be appealed.

vestigation of the appellants.[13] At the moment, we do not know when the investigation will end, whether the Commission will attempt to retain the documents, or what justification it might have if it does, if any is required at all. Our refusal to act now in no way prevents the appellants from seeking judicial relief should the Commission act unlawfully in the future.

■ We turn now to the questions concerning the documents' status as trade secrets and Commission "records." So far, no one has requested information from the documents. Should it receive a request from a member of the public under the FOIA,[14] the Commission will be fully capable then to make its determination, in the context of a particular document. Until that time, any evaluation of the Commission's views on trade secrets will focus on abstract principles instead of the contents of a specific document. Given the rapid pace of technological change—today's trade secret easily can become tomorrow's common knowledge—a ruling unrelated to particular pieces of information is of little value. Deferring consideration of the documents' status as trade secrets and Commission "records" helps ensure the full factual development of the case. See FTC v. Anderson, at ——. Moreover, any decision that this court or the Commission might make would not necessarily bind a requestor appearing later, for he would not have been a party to this case. Thus, we believe the issues have yet to crystallize into a form that permits judicial resolution.

Furthermore, little hardship will befall the appellants by delaying consideration of these questions until a request actually occurs. In the first place, the Commission has indicated that in practice it refuses FOIA requests for documents accorded confidential treatment even if they do not contain trade secrets. See note 12 supra. Should the Commission change its policy and decide to release information contained in the documents, the appellant affected will receive ten days' notice and be able to enter court then to challenge the release as an abuse of discretion or as Commission action not in accordance with law.[15] If, on the other hand, the Commission denies the request, the party seeking the information can file its own action to force disclosure. In either event, the status of the documents, both as trade secrets or confidential information and as Commission "records," will be subject to full judicial evaluation at that time. See FTC v. Anderson, at ——.

## V. THE PROTECTIVE ORDER

■ Both the appellants and the Commission challenge the district court's final protective order. The appellants contend that the district court abused its discretion in not adding further protections to ensure nondisclosure of information in the documents. The Commission argues that the promises of protection in its original subpoena order and letters according confidential treatment were within its discretion and thus the district court exceeded its authority in imposing additional safeguards. Because we believe the Commission did not abuse its discretion, we must vacate the portions of the district court's order imposing further conditions on the Commission and refuse to add the protections sought by the appellants.

■ Section 9 of the FTC Act, 15 U.S.C. § 49 (1976), gives the district courts jurisdiction to enforce subpoenas issued by the

13. For example, the Commission may require the information in another investigative proceeding, in rulemaking, or in compiling information for reports it must make under § 6(d) and (f) of the FTC Act, 15 U.S.C. § 46(d), (f) (1976).

14. The documents' status as trade secrets or Commission "records" becomes material only if a request comes from a member of the public under the FOIA, for the Commission must sur-

render the documents if sought by a congressional source. See p. 970 supra.

15. We intimate no view on whether the Commission, by indicating that in practice it denies FOIA requests for information it has accorded confidential treatment, is bound by that representation or would be abusing its discretion simply by abandoning that practice in the future.

Commission. Although leaving this power in the courts rather than the Commission indicates that judges should not simply rubber-stamp Commission subpoenas, *see generally SEC v. Arthur Young & Co.*, 584 F.2d 1018, 1032–33 (D.C. Cir. 1978), *cert. denied,* 439 U.S. 1071, 99 S.Ct. 841, 59 L.Ed.2d 37 (1979), their role is limited to determining "if the inquiry is within the authority of the agency, the demand is not too indefinite and the information sought is reasonably relevant," *United States v. Morton Salt Co.,* 338 U.S. 632, 652, 70 S.Ct. 357, 369, 94 L.Ed. 401 (1950), *quoted in FTC v. Anderson,* at 369 slip op. at 5. With regard to protective conditions, the court asks whether the agency has abused its discretion in providing safeguards. *See FCC v. Schreiber,* 381 U.S. 279, 291, 85 S.Ct. 1459, 1468, 14 L.Ed.2d 383 (1965); *FTC v. Texaco, Inc.,* 555 F.2d 862, 884 n.62 (D.C. Cir.) (en banc) ("it is the agencies, not the courts, which should, in the first instance, establish the procedures for safeguarding confidentiality"), *cert. denied,* 431 U.S. 974, 97 S.Ct. 2939, 53 L.Ed.2d 1072 (1977).

The district court's additions in this case apparently are designed to ensure the fastest possible notice to the affected appellant if a court or an arm of Congress seeks a subpoenaed document. These procedures very well may be reasonable ones. The question before us, however, is "whether the exercise of discretion *by the Commission* was within permissible limits, not whether the District Judge's substituted judgment was reasonable." *FCC v. Schreiber,* 381 U.S. at 291, 85 S.Ct. at 1468 (emphasis in original). Here, the Commission has promised to give as much notice as it reasonably can once it determines that it must honor a congressional or a judicial request. It has pointed out that historically it has been able to provide the full ten days' notice in almost every case. J.A. at 783 (affidavit of Barry R. Rubin). The Commission also has agreed to inform the requestor that the appellant believes the information sought is confidential. These guarantees appear sufficient to safeguard the appellants' interests. The incremental protection afforded by the district court's additions is speculative and minimal, and the changes would only burden the Commission by forcing it to halt other activities to contact the appellant affected immediately upon receipt of a request.

The court's order also requires the Commission to verify that a request purportedly coming from Congress has been made in accordance with applicable rules. The Commission, in conferring confidential treatment on the documents, has excepted from its commitment to ten days' notice only "official" congressional requests. Implicitly , then, it makes some effort to screen out unofficial ones.[16] Again, the district court's additions contribute little, if any, protection beyond what the Commission has volunteered to provide. Indeed, in this instance, they may embroil the Commission in needless disputes with members and committees of Congress over the propriety of their requests. *See generally Murphy v. Department of the Army,* 613 F.2d at 1157 (D.C. Cir. 1979).

▆▆▆▆ The Commission has promised to give as much notice as it reasonably can

---

**16.** The Commission has stated that in practice it treats requests from individual members of Congress, as opposed to from committees or subcommittees, as public requests under the FOIA. *See* Reply Brief of Commission at 6; J.A. at 782–83 (affidavit of Barry R. Rubin). Since this case was argued, a different panel of this court has concluded in another context that there is "no basis in the statute or in public policy for distinguishing for FOIA purposes between a congressional committee and a single Member acting in an official capacity." *Murphy v. Department of the Army,* 613 F.2d 1151 at 1157 (D.C. Cir. 1979). If *Murphy* applies here, the Commission could not lawfully withhold information sought by a member of Congress regardless of whether he complied with applicable committee or subcommittee rules, at least when he requests the information pursuant to his legislative duties and not "in a purely private or personal capacity," *id.* at 613 F.2d at 1157. The verification required by the district court thus may be irrelevant in most instances.

Of course, a request purportedly coming from some arm or member of Congress simply may be a hoax. A single telephone call could discover this fact, and the Commission would not have to surrender the document.

once it has determined that it must honor a congressional or a judicial request. It has agreed to inform the requestor that the appellant that submitted the information sought regards it as confidential. Agencies are free to determine their own procedures, as long as they do not violate constitutional or statutory safeguards. *Vermont Yankee Nuclear Power Corp. v. Natural Resources Defense Council*, 435 U.S. 519, 543–44, 98 S.Ct. 1197, 1121–22, 55 L.Ed.2d 460 (1978); *FCC v. Schreiber*, 381 U.S. at 290, 85 S.Ct. at 1467. *See Exxon Corp. v. FTC*, 589 F.2d at 587. Moreover, until evidence appears to the contrary, agencies are entitled to a presumption of administrative regularity and good faith. *See, e. g., Association of National Advertisers v. FTC*, 627 F.2d 1151 at 1174 (D.C.Cir. 1979); *Hercules, Inc. v. EPA*, 598 F.2d 91, 123 (D.C. Cir. 1978). With no indication that the Commission will act cavalierly or in bad faith, its promises of advance notice and release only pursuant to official requests adequately protect the appellants' interests and thus fall within its discretion. The district court thus erred in imposing further terms on the subpoenas as issued.[17]

## VI. CONCLUSION

The Commission has ample tools at its disposal to ensure confidential treatment for the documents under subpoena while those documents are in its control. Likewise, we must assume until shown otherwise that any congressional committee or subcommittee obtaining them will act with due regard for the appellants' rights. With no actual request for the information before us and with no present demonstration that the Commission will mishandle the documents once it possesses them, we must affirm the district court's order insofar as it enforces the Commission's subpoenas subject to the conditions the Commission imposed on itself, and we must vacate the

portions of the order that impose additional restrictions on the Commission's future conduct.

*It is so ordered.*

WALD, Circuit Judge, concurring in part and dissenting in part:

I concur in Parts I to IV of Judge Tamm's opinion for the court. As for Part V, I would affirm the district court's protective conditions imposed upon the enforcement of the FTC subpoenas.

The district court's conditions were, as to Congressional requests for access to asserted trade secret data, (1) that the FTC "verif[y] that the request is made in accordance with the requirements of the controlling congressional rule," and (2) that the FTC immediately notify, by telephone and in writing, the owner of the asserted trade secrets when such requests are made. J.A. 12. I believe that the first condition simply implemented the mandate this court laid down for the FTC in *Exxon Corp. v. FTC*, 589 F.2d 582, 592–94 (D.C.Cir.1978), and that there is substantial material in the record of the hearing before the district court to justify the second. *See* J.A. 39–49. At that same hearing, FTC counsel appeared for the most part to agree as to the appropriateness of the conditions (*see id.* at 39–41 & 46–47), even though he attempted to dissuade the district court from imposing them.

## I. THE VERIFICATION CONDITION

In *Exxon* this court held, following *Ashland Oil, Inc. v. FTC*, 548 F.2d 977 (D.C.Cir. 1976), that Congress is entitled to access to material subpoenaed by the FTC, including "trade secrets" protected from public disclosure under § 6(f) of the FTC Act. The court was careful to point out, however, that such trade secrets should "be disclosed only upon valid *formal* requests of Congress

---

17. Our determination that the Commission acted within the bounds of its discretion requires us also to reject any additional protections sought by the appellants. We do not believe that this result in any way conflicts with our decision in *Exxon Corp. v. FTC*, for in that case

we enforced subpoenas issued with protections similar to those the Commission has granted here and without any court-imposed conditions. *See* 589 F.2d at 594 (affirming district court's enforcement order "in its entirety").

or its committees." 589 F.2d at 588 (emphasis in original). The court refused to impose any mandatory notice period before disclosure in response to such requests, because it "would skirt dangerously close to being at least the temporary 'equivalent to an order quashing [the official request or subpoena] which is generally an impermissible frustration of the congressional power to investigate . . . .'" *Id.* (bracketed material in original). But the court nevertheless emphasized:

> . . . [W]e feel that there is ample justification for insisting that the Commission only reveal statutorily protected *trade secrets* when it has indeed received such a proper request or subpoena.

*Id.* at 592 (emphasis in original). The court noted that the separation of powers doctrine, which prevents the courts from interfering with Congressional demands for data, comes into play only for formal Congressional requests for access.

> . . . Election to the Congress does not give an individual subpoena power over whatever information he may happen to be interested in, and particularly not over trade secrets, whose oftentimes enormous value may be forfeited by disclosure to the public.

> . . . [A]s Congress itself has manifested a concern to prevent the issuance of subpoenas by individual members as opposed to committees, subcommittees or duly authorized committee chairmen, it is appropriate to require the FTC to take steps to ascertain the validity of a subpoena (or the formal requests it treats as subpoenas) before it releases data it is required by statute to be kept [sic] confidential.

> . . . Accordingly, although we do not require the FTC to observe the procedures proposed by the appellants to limit the manner in which the Commission responds to *formal requests* for trade secrets from Congress or its committees[,]

it is nothing more than common sense for the FTC to not disclose trade secrets except upon legally authorized requests therefore and to verify that fact before delivery. Trade secrets, by statute, are in a different position than ordinary non-confidential information within the possession of the Commission.

*Id.* at 593 (emphasis in original).

The *Exxon* court also noted that the FTC had, in January 1978, initiated a rulemaking proceeding to consider protection of the confidentiality of such data and declared: "It would seem that the rule should provide that in all instances the party will be notified immediately whenever Congress makes a proper request for trade secrets." *Id.* at 590 n.16. Two years later, however, we do not yet have any rule on confidentiality; nor could the FTC counsel at oral argument enlighten the court as to when such a rule might eventuate.[1]

In the specific enforcement proceeding involved here, the district court made several inquiries as to FTC practices with regard to responses to Congressional requests. The FTC, in answer to requests for prior notice by owners of subpoenaed trade secret material before release to Congressional committees or to a court, will promise only that it will give "as much notice as possible under the circumstances." J.A. 42; *see, e. g., id.* at 168. It will advise the requestor that the owner believes the material to be confidential, but nothing is promised about checking on the "official" nature of the request. *See FTC Operating Manual*, Ch. 15.1.3 (1978) (J.A. 718); 16 C.F.R. § 4.11 (1979) ("[r]equests for disclosure of records" from the FTC).

An affidavit in this case from an FTC employee, Barry R. Rubin, who handles such requests, alleges that "[o]nly requests from Congressional Committees and Subcommittees are treated as official requests of Congress" (J.A. 782); in no instance has the

---

1. Over a year ago in the district court hearing, FTC counsel was asked about the status of the rulemaking proceeding and answered: "The Commission has not yet ruled on that. I happen to have personal knowledge of the fact that the staff is in the process of preparing the final recommendations to the Commission . . . ." J.A. 39 (elipse in original). FTC counsel at oral argument before us was unable to be more specific.

FTC been "aware" that any such request to which it has responded was not properly authorized. *Id.* at 783. That affidavit further states that in "nearly every instance" the FTC "has been able" to provide ten days' notice when it has agreed to attempt to do so. *Id.* Although this may be the FTC's predominant practice, only the requirement for as much notice as "possible" is incorporated in its written assurances, and the language in the Rubin affidavit quoted above at least suggests that the FTC may not be "able" to give the full ten days' notice, or indeed any advance notice, in all instances.

In only one instance, the affidavit asserts, was notice provided as late as the day of release (*id.*), but the Rubin affidavit also warns:

> In *all* instances where a congressional committee or subcommittee has indicated that access is requested to Commission information prior to the end of the notice period, *the Commission has accepted that representation, has had no reason not to accept that representation and has granted access.*

*Id.* at 783–84 (emphasis supplied).

FTC counsel in this case opined in the hearing before the district court that the *Exxon* mandate to the FTC—*i. e.*, to verify that a Congressional request was "formal" —was vague, but he also admitted that the FTC's own practice of honoring only an "official request" from Congress (as set forth in the Rubin affidavit, J.A. 782) was just as indefinite:

> The problem here is that Congress works in different ways; that is, some

committees authorize their chairman to make official requests for information. So sometimes the chairman, acting alone, can do it. Some work by subpoenas; some work by other documental requests, compulsory process and aids. The putting in words, precise words exactly, what the Commission is obliged to respond to, exactly what duties it has to verify the requests, the validity of the requests, this is very difficult. I think that a general obligation on the part of the Commission to be confident, to be certain that the request is, at least, on its face an official request is appropriate; but to say that the Commission can go over to an ordinate [sic] branch of Government and start asking questions about "Who are you?" and "What is your authority in . . . .."

J.A. 46–47 (elipse in original).

The distinct impression I (and apparently the district court) glean from those remarks is that no attempt to "verify" whether a request is in conformity with applicable rules for relevant Congressional committees or subcommittees, or even with the general rules of the House or the Senate, is currently being made.[2] The district court's reaction to this disclosure was expressly to require such a verification in accordance with the *Exxon* mandate, without in any way telling the FTC how it should do its job. The rules of the House of Representatives and the Senate dealing with subpoenas are a matter of public record and easily ascertainable. Even as to nonsubpoena requests which, as the Rubin affidavit implicitly concedes, are sometimes made by tele-

---

**2.** As counsel for Owens-Corning remarked in the hearing before the district court, without contradiction by FTC counsel:

> . . . The Commission, itself, even admits that technological trade secrets fall in this class, but they refuse to classify them as trade secrets and we are told now under the proposed rule that if we turned these over, we may never get notice as to Congress because the only obligation under the rule and the letter which was read to Your Honor is to give notice after the decision to release is made, not at the time the request comes in. As you say, the request may come in to any

number of different places in the Commission from any direction.

> Also, the Exxon case in this Circuit has made it clear that the Commission has a duty to make a determination as to whether the request from Congress is an official request, was it issued pursuant to committee vote, and so on. The present Commission practice is not to do so. If a letter from a chairman of a committee on his stationery comes in, they treat it as official, whether or not official, and it may even be a telephone call.

*Id.* at 55.

phone,[3] some verification of the official nature of the request seems not only commonsensical but essential if the strictures of *Exxon* are to have any effect at all.

The majority opinion's footnote 16, suggesting that a single Congressman's request for confidential information protected by § 6(f), even though the request is unauthorized by any committee or subcommittee of Congress, may stand on the same footing as a duly authorized committee or subcommittee request, is especially troubling. In the exercise of its administrative discretion, even the FTC has not gone that far; it purportedly treats request for access to trade secrets from individual Congressmen as "unofficial," and thus akin to Freedom of Information Act (FOIA), 5 U.S.C. § 552 (1976), requests from the public. J.A. 782. Frankly, I find the majority's suggestion surprising in view of their opinion's overriding emphasis on agency discretion in these matters.

I cannot agree with the majority's citation of *Murphy v. Department of the Army*, 613 F.2d 1151 (D.C.Cir.1979) (Greene, J.), to support their position. *Murphy* dealt with the Army's disclosure to a Congressman of material otherwise exempt from mandatory disclosure to the public under the FOIA. The court invoked 5 U.S.C. § 552(c)[4] as

authority that Congress did not mean the FOIA exemptions to impede its own access to such material and found that granting such access to an individual Congressman did not amount to a waiver of the material's exempt nature. But here we deal with material specifically protected by statute from any disclosure to the public,[5] not a situation like *Murphy* where disclosure is left to the discretion of the government.[6]

Duly authorized Congressional requests were judicially recognized as a narrow exception to the § 6(f) statutory ban in *Exxon*, 589 F.2d at 592–94; therefore, it is doubly important to insure that these requests are authorized ones. The majority too casually dismisses *Exxon* in this regard. No Member of Congress, acting on his own, has yet been judicially declared to have access rights to subpoenaed trade secret material for his own individually-defined legislative purposes, no matter how legitimate his interest.

To suggest that *Murphy* may expand *Exxon's* limited access to cover any Member acting individually is to seriously dilute the protections of § 6(f), and even to undermine the duly constituted authority and processes of Congress. The Legislative branch oper-

---

**3.** The Rubin affidavit states that "nearly all" Congressional requests for subpoenaed data in the FTC's possession are written. *Id.* at 782.

**4.** That provision provides in pertinent part that "[the FOIA] is not authority to withhold information from Congress." 5 U.S.C. § 552(c) (1976).

**5.** The *Murphy* decision makes no reference to the Privacy Act of 1974 which follows the FOIA in the statute books and provides, in relevant part:

No agency shall disclose any record which is contained in a system of records by any means of communication to any person, or to another agency, except pursuant to a written request by, or with the prior written consent of, the individual to whom the record pertains, unless disclosure of the record would be—

.  .  .  .  .

(9) to either House of Congress, or, *to the extent of matter within its jurisdiction, any committee or subcommittee thereof, any*

*joint committee of Congress or subcommittee of any such joint committee.*
*Id.* § 552a(b)(9) (emphasis supplied).

**6.** Pending amendments to the FTC Act which passed the Senate on February 7, 1980 would, *inter alia*, expand the protections accorded trade secrets in § 6 of the Act to also cover "confidential commercial or financial information" and exempt all such materials from mandatory release to the public under the FOIA. S. 1991, 96th Cong., 2d Sess. §§ 3 & 15 (1980) (passed as the Senate version of H.R. 2313); 126 Cong.Rec. S1177–1242 (daily ed. Feb. 7, 1980); *see* S.Rep. No. 500, 96th Cong., 1st Sess. §§ 5, 6, 26–27, 37 & 50–53 (1979) [hereinafter *1979 Senate Report*]. Those pending amendments also emphasize that "[n]othing" in the confidentiality protections that they would place on data in the FTC's possession (see note 11, *infra*) "is intended to prevent disclosure *to either body of the Congress or to any authorized committee or subcommittee of Congress* .  .  .  ." *1979 Senate Report* at 51 & 52 (emphasis supplied).

ates in the sensitive area of trade secret disclosure with its coordinate branch, the Executive, through the structure and delegated powers of Congressional committees and subcommittees. Only if the Executive and the courts honor that structure will the Legislature itself, as well as agencies, be able to assure subpoenaed parties that their trade secret material is not subject to indiscriminate disclosure to any or all of the 535 Members of Congress with diverse political and legislative interests. That is what I think this court's 1978 *Exxon* opinion was all about. And, in fact, just recently in *United States v. Exxon Corp.*, 628 F.2d 70, (D.C.Cir. 1980) (*per curiam*), this court affirmed a district court opinion enforcing a Department of Energy (DOE) subpoena in which the district court imposed protective conditions upon all requests for access, including those of individual Members of Congress, except those made "pursuant to a request formally authorized by a committee or subcommittee of Congress with jurisdiction over the subject matter of the documents or information requested . . . ." 628 F.2d 77.[7]

## II. THE NOTIFICATION CONDITION

During his questioning of FTC counsel, the district court was told that the FTC already had a policy of immediately notifying owners of data in the FTC's possession upon receipt of a Congressional request for access. J.A. 40. FTC counsel stated that this was set out in the Rubin affidavit (*id.*), but in fact that affidavit does not speak of any such notification policy and petitioner's counsel disputed that any such policy was in effect. *Id.* at 49. FTC counsel, in answer to the district court's question whether the FTC would be willing to notify the companies upon receipt of a Congressional request in this case, said "I think so." *Id.* at 41. He later pulled back to suggest that the FTC might have difficulty in giving that notification "immediately," because requests come into personnel all over the Commission (even secretaries), but FTC counsel without equivocation stated that "at the point in [sic] which the request is funnelled to the person who knows about this case, who knows about the documents, at this point notice will be given." *Id.* at 42.[8] It subsequently developed that all

---

7. The confidentiality protections in the recent *Exxon* opinion were put forth by the FTC as a basis for settlement, as were the protections imposed in *FTC v. Texaco, Inc.*, 555 F.2d 862 (D.C.Cir.) (*en banc*), *cert. denied*, 431 U.S. 974, 97 S.Ct. 2939, 53 L.Ed.2d 1072 (1977) (see *infra*), but that merely reinforces the view that imposing such protections on the FTC was not unreasonable.

8. The relevant portions of that colloquy were:

    THE COURT: . . . What reason is there why there should not be in connection with this order a directive from me that immediately upon a request for any trade secret document that you receive, a formal or proper request from Congress or by reason of a court subpoena, that you will give telephonic and written notice to the parties? Now I meant to say immediately. What is the problem with that as a practical working arrangement?

    MR. GRIMES [FTC counsel]: It has been the Commission's policy to do, essentially, that.

    THE COURT: Well, then, that encourages me to think that it's possibly, a good idea.

        \*     \*     \*     \*     \*     \*

    THE COURT: It's not advanced notice. [Repeating] It's not advanced notice. You

get forthwith requests. Congressmen call up and say, "I want it down here noon tomorrow; bring your staff, we're going to have a hearing."

    MR. GRIMES: You may want to look at the Respondent's Exhibit 22, which is an affidavit filed by a Commission staff attorney who is directly involved with these kind of requests over the years and that was an affidavit filed in the Anderson proceeding before Judge Flannery. In that affidavit, he discusses what the Commission has done in past cases and he indicates that in situations like this, the Commission has immediately advised respondents by telephone.

    THE COURT: You'd be willing to do that here?

    MR. GRIMES: I think so. Now my problem is any time you're asking me whether my agency should be subjected to a court order like that, it seems to me you're calling into question the presumption of good faith that we would do that anyway. You are also subjecting us . . .

    THE COURT: Well, your rules don't say . . .

    MR. GRIMES: Well, I think there is a good reason why the rules don't say that and that is that if, for example, a request under FOIA

Congressional requests are channelled into the Office of General Counsel at the FTC and that decisions are made upon them by the Commission. *Id.* at 92–93; *cf. FTC Operating Manual*, ch. 15.1.3 (1978) (J.A. 718).

Under these circumstances, I believe the district court was justified in probing further as to how the FTC intended to comply with its "promise" to give as much notice as possible. The Supreme Court recently recognized for example, in rejecting a National Labor Relations Board decision to require an employer to disclose certain aptitude testing materials to union officials, that agency determinations on confidentiality are not sacrosanct. *Detroit Edison Co. v. NLRB*, 440 U.S. 301, 99 S.Ct. 1123, 59 L.Ed.2d 333 (1979). There the Court held:

> . . . [T]he rule of deference to the Board's choice of remedy does not constitute a blank check for arbitrary action. The role that Congress in § 10(e) [of the Administrative Procedure Act, 5 U.S.C. § 706(e) (1976)] has entrusted to the courts in reviewing the Board's petitions for enforcement of its orders is not that of passive conduit.

*Id.* 99 S.Ct. at 1132 (citation omitted).

No one disputes that if the owners of trade secrets do not know in time of the likelihood of release of their material to Congress, they can neither attempt to dissuade the FTC from releasing the data,[9] nor

---

comes in—they generally come into the secretary's office at a very low level—the request may come in, say, today . . .

THE COURT: I'm not talking about the FOIA. I'm talking about Congress. . . .

\*   \*   \*   \*   \*   \*

MR. GRIMES: Ultimately, notice will be given in this case. The problem is supposing the request comes in to someone's secretary and the person is out, obviously, the documents will not be produced without giving them as much notice as possible, but the Commission is a big organization and . . .

THE COURT: Yes.

MR. GRIMES: . . . at the point in which the request is funneled to the person who knows about this case, who knows about the documents, at that point notice will be given. But I can't—For example, if you were to commit us in a court order and say that that will be immediately after receipt of the request, the person might be out that day, someone might be on vacation, and I think what the Commission is committed to doing is giving as much notice as possible under the circumstances, and certainly, if a request comes in from Congress or the court that documents should be turned over immediately, we have committed ourselves in our policy to give as much notice as possible. That means as soon as the person who knows about this gets that notice that the person wants the documents, he immediately is on the phone and the respondent is telling him that.

Now I don't see how we can commit ourselves to do any more than that, really.

\*   \*   \*   \*   \*   \*

THE COURT: So you say you are committed to giving as much notice as possible?

MR. GRIMES: I believe the term is something like, "as much notice as reasonably possible," or ". . . as possible," or something like that.

THE COURT: Well, I did remember that, "reasonably." "Reasonably" is one of the most convenient weasels in the administrative law.

MR. GRIMES: Well, I think . . .

THE COURT: "Reasonably," that has no bite to it. It's all deliberate speed. I mean, it isn't anything that talks about telling them— You see?

I'm sure you don't intend that, and I am not trying to cabal [sic] with you, but I'm trying to pin it down.

J.A. 39–43 (elipses in original).

9. The description of a Congressional request for data from the FTC or any federal agency as "official" or "formal" as opposed to "unofficial" or "informal" is misleading. Any Congressional request short of subpoena is technically just that: a "request." Such "requests" to the Executive are often followed by extensive negotiations between the department or agency and Congress as to what material will be disclosed to the Congressional investigator and under what conditions of confidentiality. It is only at the point that such negotiations break down that a subpoena is resorted to. Even where Congressional subpoenas have been issued, substantial negotiations before production as to the manner of compliance are commonplace. For example, in *United States v. American Tel. & Tel. Co.*, 551 F.2d 384, 385–88 (D.C.Cir.1976), *on appeal after remand*, 567 F.2d 121, 123–25 (D.C.Cir.1977), there were extensive negotiations between the Justice Department and Representative John Moss, Chairman of the Subcommittee on Oversight and Investigations of the House Committee on Interstate and Foreign Commerce, over conditions to be imposed on AT&T's response to a subpoena from the Subcommittee asking for

seek judicial relief.[10] Additionally, they cannot negotiate on their own with the legislators requesting access to honor the owners' pleas of confidentiality, and they are at a disadvantage in taking timely precautions if the material should be subsequently released to the public by Congress.[11]

The district court has fairly—and reasonably—required that the trade secret owner be notified of a Congressional request for access upon its receipt by the person at the FTC charged with the responsibility of dealing with such requests. The district court's order need not be read (as the FTC apparently does) to require notice upon the mere physical receipt by anyone at the FTC of a Congressional request for access, even when it is received by FTC personnel who know nothing about the case. The purpose of the district court's notice condition is simply to give the trade secret owners notice of Congressional requests at the point the FTC begins to consider them.

## III. THE PROPER STANDARD OF REVIEW

I do not doubt the district court's authority to act as it did here. In *FCC v. Schreiber*, 381 U.S. 279, 291, 85 S.Ct. 1459, 1468, 14 L.Ed.2d 383 (1965), the Court reversed the Ninth Circuit's affirmance of conditions imposed on a Federal Communications Commission (FCC) investigation by a district

court, finding that "[t]he question for decision was whether the exercise of discretion *by the Commission* was within permissible limits, not whether the District Judge's substituted judgment was reasonable." (Emphasis in original). *Schreiber* concerned an FCC investigation of the television industry in which the Music Corporation of America, Inc. (MCA), unsuccessfully sought FCC assurances that certain subpoenaed data would be kept confidential. Following that rejection, MCA—again without success—requested that *all* its data and even testimony of its representatives not be publicly disclosed. *Id.* at 286, 85 S.Ct. at 1465. In subsequent enforcement proceedings, the district court required that all MCA testimony and documents received by the FCC be held in confidence and made public only after the conclusion of the investigation and upon a showing of "good cause" by the FCC to the court. *Id.* at 287 n.14, 85 S.Ct. at 1465–1466.

The Supreme Court upheld the agency's right to fashion its own investigative procedures, including deciding whether hearings would be public or closed, because agencies are "familiar with the industries which they regulate and will be in a better position than federal courts or Congress itself to design procedural rules adapted to the peculiarities of the industry and the tasks of the agency involved." *Id.* at 290, 85 S.Ct. at 1467. The Court cautioned against judicial

materials on FBI wiretaps. It is obviously in the negotiation period between a Congressional request and the FTC's decision to release that the data owner can best use his arguments with the agency and even with Congress to deter or condition release, but he can do that only if he knows that the request has been made.

**10.** Both *Ashland* and *Exxon* leave open the possibility of judicial intervention to block the FTC's release to Congress of data containing trade secrets, if the owners of that data can establish that it is likely that Members of Congress or Congressional employees will act irresponsibly, such as by demonstrating a history of past releases by them to the public of data containing trade secrets. As the *Exxon* court remarked:

 . . . This court cannot assume that Congress will act irresponsibly in regulating

or disclosing appellants' trade secrets. *Barring the imminence of such disclosure*, appellants' constitutional rights are not in fact jeopardized by delivery of their secrets to Congress. *On this record* there is no justification for this court to interfere with the operations of the legislative branch . . . .
589 F.2d at 590 (emphasis supplied; citations omitted).

**11.** The pending amendments to the FTC Act would also require, as to materials obtained by the FTC pursuant to an investigation into possible statutory violations, or as to other materials in the FTC's possession which the owner or provider designates as confidential, that the FTC "immediately notify the owner or provider of any such information" when Congress requests it. *1979 Senate Report* at 51 & 52; *see also id.* at 27.

second-guessing of an agency's "procedural rule, establishing a presumption in favor of public proceedings . . . ." *Id.* at 293, 85 S.Ct. at 1469. That rule itself, however, made provision for individualized appeals to the FCC for confidential treatment of particular documents, and the Court noted that "[i]f and when information was demanded which if disclosed might in fact injure MCA competitively, there would be ample opportunity to request that it be received in confidence, and to seek judicial protection if the request were denied." *Id.* at 296, 85 S.Ct. at 1470 (citation omitted). This is precisely what is happening here.

This is a subpoena enforcement proceeding involving specific documents as to which the owners have asserted a § 6(f) privilege and as to which the owners seek protective conditions which the FTC has already rejected.[12] Thus, we are at the point which had not been reached in *Schreiber, i. e.,* the data owners here have "request[ed] that [their trade secret data] . . . be received in confidence," and they are now "seek[ing] judicial protection [since their] . . . request[s] were denied." *Id.* This is not a pre-enforcement action where there might be uncertainty as the FTC's position on whether and to what extent it will enforce its subpoenas, nor is this case like *Wearly v. FTC,* 616 F.2d 662 (3d Cir. 1980), where the FTC "has yet to take a position on which documents should be subject to what type of confidential treatment." At 667.

*Wearly* in fact supports the data owners here. Although the Third Circuit there found a pre-enforcement proceeding premature, it noted:

> . . . In acting on [a] . . . petition [by an agency for an order enforcing a subpoena] the district court's role is not that of a mere rubber stamp, but of an independent reviewing authority called upon to insure the integrity of the proceeding. "The system of judicial enforcement is designed to provide a meaningful day in court for one resisting an administrative subpoena." . . . In the discharge of that duty, the court has the power to condition enforcement upon observance of safeguards to the respondent's valid interests.

*Id.* at 665 (citation omitted; footnote omitted). *Cf. FTC v. Johns-Manville Corp.,* 1979–2 Trade Cas. ¶ 62,830 at 78,792–93 (D.Colo.1979) (holding that *Schreiber* was not controlling in an FTC subpoena enforcement action because in *Schreiber* the FCC acted pursuant to a validly promulgated regulation while the FTC had not adopted such a rule regarding the confidentiality of subpoenaed material).

The FTC has itself provided the "10 day notice" assurance with respect to the release of these same documents to other—*i. e.,* non-Congressional—requestors, thereby preliminarily validating the documents' eligibility for some protection from disclosure. Since the FTC cannot assure 10 days' pre-release notice for Congressional requests, it seems only reasonable that the FTC should

---

**12.** The documents here were turned over to the FTC after the district court entered its order enforcing the subpoenas and this court denied the data owners' request for a stay pending appeal. But several months before the FTC brought this action the companies unsuccessfully moved the FTC to quash or impose protective provisions on the subpoenas, *see e. g.,* J.A. 177–97, and after this court's *Exxon* opinion in December 1978 the companies specifically offered, again without success, to comply with the subpoenas if, *inter alia,* the FTC would not release the data to Congress except pursuant to a formal request and if the FTC would give the data owners immediate notice of any Congressional request for access. *See id.* at 566a, 566b, 837 & 841.

As the FTC concedes, "[t]he documents withheld by the respondent companies were made available to Commission staff attorneys for inspection at the offices of [the data owners'] counsel . . . ." Gov't Br. 3 n. 3. Although limited, the "focus" of that examination was:

> . . . [T]o determine whether respondents had made a *prima facie* showing that the information falls within the scope of "trade secrets and commercial or financial information obtained from a person or privileged or confidential" (5 U.S.C. § 552), so as to warrant a Commission pledge of ten day notice protection.

*Id.* (emphasis in original).

do what it can to provide notice at the earliest possible time, *i. e.*, when a request comes in. Requiring notice at the receipt of a request for access seems clearly necessary if the trade secret owners are to have any opportunity to plead their case at the FTC level about what is to be released under what conditions or assurances. Otherwise, by the time "reasonable" notice of the FTC's decision to release data to Congressional committees comes, the agency position will have hardened and any dialogue between the agency and the owner about disclosure will be frozen or futile, or the documents may already have been released.

Since *Schreiber*, courts have continued to impose protective conditions on enforcement of agency subpoenas in appropriate circumstances. This court's recent *Exxon* opinion regarding DOE's subpoena enforcement powers reaffirms this authority: "Since the enforcement of a subpoena is an independent judicial action, and not merely an action ancillary to an earlier agency action, *ICC v. Brimson*, 154 U.S. 447, 14 S.Ct. 1125, 38 L.Ed. 1047 (1894), *a court is free to change the terms of an agency subpoena as it sees fit. Flotill Products, Inc. v. FTC*, 278 F.2d 850, 852 (9th Cir. 1960)." *Exxon*, 628 F.2d 75 (emphasis supplied). That principle is by no means novel, as Judge Robinson recognized in *SEC v. Arthur Young & Co.*, 584 F.2d 1018, 1032–33 (D.C.Cir.1978):

> Enforcement of administrative subpoenas has long been committed, not to administrative tribunals themselves, but instead to the courts. Power to enforce subpoenas . . . is cast in this tradi-

tional mold, without limitation on the court's discretion to set terms ensuring that the enforcement order does not become an engine of oppression. Stated somewhat differently, judicial authority to temper enforcement with fairness stems inexorably from congressional entrustment of subpoena enforcement to the judiciary.

(Citations omitted). The *Arthur Young* panel noted that the subpoena enforcement court, "in formulating protective conditions for administrative subpoenas, . . . may resort analogously to techniques conventional to judicial subpoena[s] . . . ." *Id.* at 1033. *Cf.* Fed.R.Civ.P. 26(c)(7) (permitting protective orders insuring "that a trade secret or other confidential research, development, or commercial information not be disclosed or be disclosed only in a designated way").[13] Furthermore, in reviewing the imposition or rejection of such protections, the standard for review is whether the district court exercised sound discretion, taking *Schreiber's* mandate into consideration. *FTC v. Lonning*, 539 F.2d 202, 211 (D.C.Cir.1976) ("[t]he decision as to the type and scope of any protective order rests within the sound discretion of the trial judge and must be determined on a case by case basis") (footnote omitted); *accord, EEOC v. Packard Elec. Div., GM Corp.*, 569 F.2d 315, 317–18 (5th Cir. 1978); *NLRB v. Friedman*, 352 F.2d 545, 547 (3d Cir. 1965) (standard of review is "whether or not there was an abuse of [the district court's] . . . discretion"), *quoting Goodyear Tire & Rubber Co. v. NLRB*, 122 F.2d 450, 453 (6th Cir. 1941).

---

**13.** The Second Circuit in *United States v. GAF Corp.*, 596 F.2d 10 (2d Cir. 1979), appears to have reached the same result. That case dealt with the question of whether a civil investigative demand (CID) of the Department of Justice, similar to a subpoena, could be enforced against a party for documents it obtained from the target of a government antitrust investigation. GAF had obtained documents from Kodak, the target of the government investigation, in a private antitrust action subject to an order of the district court in the private action that GAF would not disclose the documents to anyone else. In upholding enforcement of the CID, the court of appeals relied upon the sound

discretion of the district court in the government action to protect the parties' interests: "We uphold the power of the District Court . . . to superimpose upon any enforcement orders such protective orders as may be required to safeguard the interests of the parties in the particular circumstances." *Id.* at 76,758 (citation omitted). The Second Circuit concluded that "[a]n enforcement order in this case, accordingly, should specifically prohibit the government from any further disclosure without the consent of Kodak as the 'producer' of documents under [the CID statute] . . . ." *Id.* at 76,757.

*Schreiber* of course requires that due deference must be given to the agency's own judgment of what kind of protective conditions are appropriate in view of its practices and any potential abuses.[14] But the reality is that the agency seeking enforcement of its own subpoenas will almost inevitably wish them enforced with the least number of conditions or restrictions on what it may do with the material. Here the FTC has in effect agreed that the notice condition is reasonable and feasible, and asserted that it is actually provided in most cases. J.A. 42. The FTC simply did not want to be required to provide that notice in all cases by court order. *Id.* But post-*Schreiber* district courts have imposed conditions, not unlike those at issue here, that confidential subpoenaed material not be disclosed to competitors, *FTC v. Continental Can Co.,* 267

F.Supp. 713 (S.D.N.Y.1966), and that sensitive information in documents not be given over to any third party (except grand juries) without ten days' notice in order to let the parties apply to the court for relief, *SEC v. Lockheed Aircraft Corp.,* 404 F.Supp. 651 (D.D.C.1975).[15]

The district court here was similarly exercising its discretion; it is the propriety of its actions which we should be evaluating. I do not believe that the rationale of *Schreiber* compels so absolute a deference to the FTC's self-imposed disclosure provisions that a district judge retains no discretion to provide the owner of statutorily-protected material with reasonable assurances of immediate notice and verification when Congressional requests are made for access to that material.

**14.** In *Schreiber* the Court noted, contrary to the situation here, that "neither the District Court nor the Court of Appeals inquired into the validity of the Commission's exercise of its rulemaking authority. Instead the District Court devised procedures to be followed by the Commission on the basis of the court's conception of how the public and private interests could best be served." 381 U.S. at 291, 85 S.Ct. at 1468. The district court here conducted an inquiry into how the FTC proposed to insure confidentiality under § 6(f) and the *Exxon* mandate, and imposed nothing more than what the FTC effectively conceded was appropriate and already being done in large part.

**15.** *FTC v. Texaco, Inc., supra,* note 7, cited by the majority opinion, is not contrary to the result I would reach here. The subpoenaed parties there had not supplied the material at issue at the time of the court's opinion, and the FTC had not ruled on specific requests for confidential treatment. In contrast, here the FTC has all the documents it requested and it has refused the trade secret owners' pleas for an *Exxon* verification requirement and notice upon receipt of a Congressional request for access. Additionally, although the *Texaco* court eschewed adopting a general notice rule, it adopted a condition *put forth by the FTC itself* for settlement purposes and required the FTC to give ten days' notice *even before releasing the subpoenaed material to Congress.* The making of that offer by the FTC indicates at the very least that it is not universally opposed to any interference with its ability to respond immediately to Congressional requests for access to subpoenaed data. See note 7, *supra.* The *Texaco* court noted that "[s]uch a procedure would, of course, provide an opportunity for judicial review at some later date, if the [sub-

poenaed parties] . . . believe that a particular proposed disclosure is improper." *Id.* at 884–85. The district court's requirement here for notice upon the FTC's receipt of a Congressional request simply provides a similar opportunity for trade secret owners to seek judicial review of, and perhaps to provide substantive input into, the FTC's decision to release data to Congress.

This court's opinion in *Appeal of FTC Line of Business Report Litigation,* 595 F.2d 685 (D.C. Cir.) (*per curiam* ), *cert. denied,* 439 U.S. 958, 99 S.Ct. 362, 58 L.Ed.2d 351 (1978), in which Judge Bazelon (the author of the opinion for the court in *Texaco* ) joined, directly cuts against the majority's invocation of *Schreiber* and *Texaco* for the proposition that we must concern ourselves only with whether the FTC has abused its discretion and not with whether the district court's imposition of protections was appropriate. The lower court in *Line of Business* had imposed a ten day notice requirement on the FTC's release of Corporate Patterns Reports (CPR) data, "[s]ince the CPR appellants' claims involve the potential release of their individual company data." *Id.* at 707. A ten day notice provision was necessary, the district court found, " '[i]n order to protect the corporate parties from any precipitous action on the part of the FTC' before appellants could exhaust their administrative remedies." *Id.* As this court concluded when reviewing that decision: "Although we stated expressly in *Texaco* that such an order is not required as a general rule, we think the District Court's issuance of a protective order under the circumstances at bar *was well within its discretion.*" *Id.* (emphasis supplied; footnote omitted).

The district court here, furthermore, examined the practical burdens that its two prescribed conditions would impose. It apparently concluded (and I agree) that the burden of both conditions on the FTC is small since the FTC currently channels all Congressional requests to the General Counsel's office for decision by the Commission itself. As to the notification condition, the following colloquy is instructive:

THE COURT: Yes. So they [*i. e.*, Congressional requests for access] all go to the General Counsel?

MR. GRIMES [FTC counsel]: That's correct, and the Commission is the body that finally decides whether to grant that request from Congress. The *Ashland Oil* case . . .

THE COURT: If that's so, then there is no practical reason why the General Counsel can't advise these people at the time they get the request, is there? It's centralized, so therefore, you've got a mechanism.

MR. GRIMES: I would agree, as soon as the . . .

THE COURT: He can just pick up the telephone and tell them as soon as he hears about it.

MR. GRIMES: As soon as the General Counsel knows about it, we certainly would be aware of it in this case.

THE COURT: Sure. They wouldn't have the question of people away on vacation, or his secretary needs to come in.

J.A. 93 (elipses in original). As to the requirement of ascertaining that Congressional requests are authorized, that too, as the district court concluded, should not be unduly burdensome, again because of the FTC's practice of channeling such requests to the General Counsel's office. *Compare id.* at 47–48 *with id.* at 93.

## IV. CONCLUSION

In sum, the district court's conditions appear to be entirely reasonable in view of the present practices of the FTC as disclosed at the hearing before the district court, and in view of this court's mandate to the FTC in our 1978 *Exxon* opinion. Nor is there any

ground to believe that those conditions impose any undue burden on the FTC. It may be that as a result of its rulemaking proceeding, the FTC will propose different or better solutions to the problem of implementation of the "trade secret" provision, but for now it has none except its "as much as possible" notice promise. Nor do I find persuasive the argument that there is no need to impose the district court's minimal protections unless or until the FTC releases data pursuant to an unauthorized Congressional request or without as much prior notice as "possible." This proceeding involved many alleged trade secret documents, and if the owners have any enforceable rights with respect to these documents, protective conditions must precede, not follow, unauthorized releases.

Accordingly, I would affirm the district court here in all respects.