## UNITED STATES INTERNATIONAL TRADE COMMISSION, Appellant,

v.

## TENNECO WEST.

### No. 86–5505.

United States Court of Appeals, District of Columbia Circuit.

Argued March 9, 1987.

Decided June 16, 1987.

Carolyn E. Galbreath, Atty. Intern. Trade Com'n, with whom Michael P. Mabile, Asst. Gen. Counsel, Intern. Trade Com'n, Washington, D.C., was on the brief, for appellant.

Donald J. Mulvihill, with whom Marshall H. Silverberg and Kathy M. Silberthau, Washington, D.C., were on the brief, for appellee.

Before WALD, Chief Judge, EDWARDS and GINSBURG, Circuit Judges.

WALD, Chief Judge:

In connection with an antidumping investigation, the United States International Trade Commission (ITC or Commission) sought enforcement in District Court of an administrative subpoena against Tenneco West, Inc. (Tenneco). Although the parties had agreed on the nature of the materials to be turned over to the ITC, they disagreed as to whether a protective order was needed to assure the confidentiality of those materials. The court resolved the dispute by issuing a protective order requiring the ITC to provide at least ten days notice to Tenneco before releasing any materials pursuant to a third-party request. We affirm the order.

## I. BACKGROUND

Acting on a petition from domestic growers and processors/roasters of in-shell pistachio nuts, the ITC began an investigation of the importation of such nuts from Iran. *See Certain In-Shell Pistachio Nuts From Iran,* Inv. No. 731–TA–287 (Final), 51 Fed. Reg. 25,408, ITC Pub. No. 1875 (July 1986), *on appeal sub nom. Pistachio Group of the Association of Food Industries, Inc. v. United States,* Court No. 86–08–01037 (United States Court of International Trade). After both it and the Department of Commerce issued affirmative preliminary determinations that in-shell pistachio nuts from Iran were being sold at less than fair value, 50 Fed.Reg. 47,852 (1985); 51 Fed.Reg. 8,342 (1986), the ITC sent out questionnaires concerning confidential, proprietary, and other business information to domestic producers of pistachio nuts, including Tenneco, who was never a party to the investigation. Following some squabbling, the ITC and Tenneco agreed that all questionnaire data minus Tenneco's customer lists would be submitted, but Tenneco still sought an order from the District Court to protect the confidentiality of the submitted information.

On June 3, 1986, the District Court issued an order requiring Tenneco to submit the stipulated data, and requiring that the ITC afford Tenneco ten days notice prior to releasing any of the submitted documents

pursuant to a third-party request (except a grand jury or congressional committee, in which case the ITC had to give Tenneco notice of the request a reasonable time prior to disclosure and inform the requesting party of Tenneco's claims of confidentiality). Furthermore, if Tenneco were to apply to the court for relief during that ten day period, then the ITC would be further enjoined from releasing information until a court ruling. In an accompanying unpublished memorandum opinion, the District Court explained that the ITC "agrees that the issuance of the requested protective order will not impede its investigation," and added that a protective order "merely grants additional safeguards to Tenneco West in the event there is a request from a third party for the release of some or all of the confidential information," citing *GTE Sylvania, Inc. v. Consumers Union of the United States, Inc.*, 445 U.S. 375, 100 S.Ct. 1194, 63 L.Ed.2d 467 (1980). Memorandum Opinion (Mem.Op.) at 2, ITC Brief Appendix (Br.App.).

The ITC appealed, arguing that the District Court had not been presented with a case or controversy, that the court abused its discretion in issuing the protective order, and that the court erred as a matter of law by relying upon *GTE Sylvania.*

## II. JURISDICTIONAL ISSUES

### A. *ITC's Standing on Appeal*

■ Although neither party raised the issue, we first consider whether the ITC has standing to appeal the order. The ITC admitted below that the protective order would not harm its anti-dumping investigation, Hearing Transcript (Hear.Tr.) at 10, Tenneco Br.App. at 33, but nonetheless claims injury from the issuance of the order. The ITC argues that the order will

make future investigations more difficult, because subjects of information requests will be less likely to come forward with information if they think the ITC itself cannot adequately protect the confidentiality of such information. Similarly, the ITC contends that the order will give rise to an implication that it would not on its own abide by 19 U.S.C. § 1677f(b), *see* note 3, *infra*, which it claims protects the confidentiality of information acquired through its investigations.

These claims of injury do not suffice to give the Commission standing to appear before us. The Supreme Court has recently reiterated that a mere claim that challenged action will have a chilling effect on future activities does not suffice for standing. *Meese v. Keene,* —— U.S. ——, ——, 107 S.Ct. 1862, 1867, 95 L.Ed.2d 415 (1987). The ITC's contentions regarding injury boil down to a fear that its future investigations will be chilled; such unspecific fear of future injury cannot suffice to provide standing under Article III. *See, e.g., Blum v. Yaretsky,* 457 U.S. 991, 1000, 102 S.Ct. 2777, 2784, 73 L.Ed.2d 534 (1982) (threat of future injury must be "sufficiently substantial").

■ We find, however, that the Commission does have standing to pursue this appeal, for a different reason. The protective order itself alters the relations between the parties, placing the ITC under a legal compulsion as to its procedures regarding release of the information that it was not previously subject to. In this way, the protective order in this case creates a legal obligation with attendant sanctions for its violation that impacts on the ITC sufficiently to cause a legal injury cognizable for Article III standing purposes.[1]

1. Although not raised by the parties either, we address here the possible argument that the case is moot. Since the protective order was issued, the anti-dumping case has been appealed to the United States Court of International Trade (CIT) from the ITC's final affirmative determination and publication of an anti-dumping order, Inv. No. 731–TA–287 (Final), 51 Fed.Reg. 25,408, ITC Pub. No. 1875 (July 1986); 51 Fed.Reg. 25,922 (1986). The submission of the record in the case to the CIT could raise the prospect that the

ITC no longer controls Tenneco's information and would no longer be in a position to release the information. *See* J. O'Reilly, Federal Information Disclosure § 8.02, p. 8–5 n. 7 ("An agency which is not the custodian of documents cannot deliver them."). However, the governing statute regarding appeals to the CIT provides that the record on appeal consists of a "copy" of the ITC's gathered information:

In any civil action commenced in the Court of International Trade under section 516A of

**76**

## B. *Existence of a Case or Controversy*

█ The Commission argues that because the parties essentially agree that the questionnaire information is confidential and may not be disclosed, no case or controversy was presented to the District Court and thus it had no jurisdiction to enter the protective order. Despite what appears to be a good faith belief on the part of the ITC that Tenneco's questionnaire replies are ultimately protected by federal statutes, *see also* part III.C., *infra,* the Commission nonetheless vigorously opposed the issuance of a protective order, which Tenneco equally strongly supported. It is clear that when the parties do not desire "precisely the same result" an Article III case or controversy may be present. *GTE Sylvania, Inc. v. Consumers Union of the United States, Inc.,* 445 U.S. 375, 382–83, 100 S.Ct. 1194, 1199–1200, 63 L.Ed.2d 467 (1980). In *GTE Sylvania,* the Consumer Product Safety Commission (CPSC) and Consumers Union agreed that GTE's information should be released. However, the CPSC believed it could not release the materials while a federal district court injunction prohibited it from doing so, while Consumers Union argued that since it had not been a party to GTE's injunctive lawsuit, its rights to seek disclosure were not implicated by the injunction. The Court held that "[t]he [CPSC] and [Consumers Union] sharply disagree on this question.... It cannot be said, therefore, that the parties desire precisely the same result." *Id.* at 383, 100 S.Ct. at 1200 (internal quotation omitted).

Similarly here, the ITC and Tenneco "sharply disagree" on the question of whether a protective order is necessary to guarantee the nondisclosure both parties agree is appropriate under federal law. In short, the parties agree on the end, but not the means to that end. Regardless of the underlying agreement as to the substantive standards for disclosure of confidential information, the disagreement surrounding the need for a protective order thus indicates that a real dispute exists.

## III. ISSUANCE OF PROTECTIVE ORDER

### A. *Standard of Review*

█ In determining whether a district court appropriately entered a protective order regarding confidential materials submitted pursuant to an agency subpoena, we are guided by *FCC v. Schreiber,* 381 U.S. 279, 85 S.Ct. 1459, 14 L.Ed.2d 383 (1965), and *FTC v. Owens-Corning Fiberglas Corp.,* 626 F.2d 966 (D.C.Cir.1980). In *Schreiber,* the Supreme Court held that "[t]he question for decision was whether the exercise of discretion *by the Commission* was within permissible limits, not whether the District Judge's substituted judgment was reasonable." *Id.* at 291, 85 S.Ct. 1468 (emphasis in original). Although *Schreiber* concerns the issue of whether an FCC procedural presumption in favor of public instead of *in camera* investigative proceedings was "within permissible limits," its lesson is that a court must focus on the adequacy of the agency's (and not the district court's) discretion regarding what is necessary to protect confidentiality.

*Owens* involves an application of *Schreiber* in a fact setting closer to the case at bar. In *Owens,* the FTC sought enforcement of an administrative subpoena, and promised in writing that it would

---

the Tariff Act of 1930, ... the administering authority or the Commission shall transmit to the clerk of the court the record of such action, as prescribed by the rules of the court. The record shall, unless otherwise stipulated by the parties, consist of—

(A) a copy of all information presented to or obtained by the administering authority or the Commission during the course of the administrative proceedings, including all governmental memoranda pertaining to the case and the record of ex parte meetings required to be maintained by section 777(a)(3) of the Tariff Act of 1930; and

(B)(i) a copy of the determination and the facts and conclusions of law upon which such determination was based (ii) all transcripts or records of conferences or hearings, and (iii) all notices published in the Federal Register. 28 U.S.C. §§ 2635(b)(1)(A) & (B). Indeed, at oral argument counsel for Tenneco indicated that the information remains with the ITC even after appeal to the CIT, and the Commission's counsel did not object to this statement. Thus, based on the information before us, the case is not moot.

provide Owens reasonable notice (ten days when possible) prior to disclosing any subpoenaed information pursuant to a congressional or judicial request. 626 F.2d at 969. The Commission also agreed to inform the requestor that Owens believed the information sought was confidential. *Id.* at 974. The District Court supplemented this promise by requiring the FTC to advise Owens of any such request immediately upon its receipt. *Id.* at 970. We reversed the District Court's supplementation on appeal, holding under *Schreiber* that the FTC's promises were "sufficient to safeguard the appellants' interests" in confidentiality. *Id.* at 974.

### B. *Did the ITC Agree to Notify Tenneco Before Releasing Documents?*

The ITC maintains that it has agreed to provide Tenneco notice within a reasonable time prior to release of documents in the event of any third-party request, and that this agreement clearly satisfies the "within permissible limits" standard for agency action under *Schreiber* and *Owens*. If indeed the Commission had made such a promise, it would be difficult, if not impossible, to distinguish *Owens* from this case. However, our reading of the record reveals no such pledge by the ITC regarding notice. The ITC cites to two pages of the hearing transcript from the District Court proceeding below. On page 5, the ITC's counsel stated that the ITC's "practice" has been to inform the provider of information whenever the Commission concludes that the information might not be protected under the Freedom of Information Act (FOIA). Hear.Tr. at 5, Tenneco Br.App. at 28. This is certainly not a promise to give notice a reasonable time before release of Tenneco's information. Cf. part III.C., *infra* (regarding the ITC's other argument based in part on this "practice").

On page 21 of the transcript, the ITC's counsel agreed to inform Tenneco if and when the anti-dumping case were appealed to the CIT. Hear.Tr. at 21, Tenneco Br., App. at 44. Again, this statement fails to qualify as an agreement to provide notice a reasonable time before disclosing Tenneco's documents. In sum, although the Commission asserts on appeal that it has agreed to provide notice a reasonable time prior to release of Tenneco's information, we can find no evidence in the record of such an agreement.[2]

Thus, neither *Schreiber*, which held an FCC procedural rule to be "within permissible limits," nor *Owens*, which held an agency agreement to provide notice a reasonable time before disclosure to be "within permissible limits," directly controls this case. The remaining issue is whether the ITC has abused its discretion insofar as taking adequate steps to protect the submitter's confidentiality.

### C. *Evaluating the ITC's Use of its Discretion*

The ITC makes two additional arguments in opposing the protective order as unnecessary to assure confidentiality. The first claims that Tenneco's materials are already protected by federal law. We ultimately reject this contention as being irrelevant to the issue before us. The second argument relies upon the ITC's stated "practice" of opposing disclosure requests or notifying affected parties otherwise. We hold this to be an insufficient assurance to satisfy the dictates of *Schreiber* and *Owens*.

The Commission claims that Tenneco's information is safe without a protective order. It points first to 19 U.S.C. § 1677f(b), which on its face appears to prevent disclosure of confidential information submitted to the ITC, with exceptions that admittedly do not apply in this case.[3]

---

**2.** The case might be different had the ITC admitted that it had failed to provide notice below, but then agreed on appeal to provide such notice. In that instance, we would have to determine whether agency counsel's promises on appeal can suffice to fulfill the *Schreiber* "within permissible limits" test. Since we are not faced

with such a scenario, we need not decide the question.

**3.** Section 1677f(b) reads, in relevant part, as follows:

Except as provided in subsection (a)(4)(A) [regarding summaries that do not reveal the discloser's identity] and subsection (c) of this section

The Commission next points to exemptions 3 and 4 of the FOIA, 5 U.S.C. §§ 552(b)(3) & (4), and contends that Tenneco's information would fit within those exemptions as well and thus not be subject to mandatory disclosure.[4] Finally, the Commission also indicates that the Trade Secrets Act, 18 U.S.C. § 1905, prohibits disclosure of confidential information like that involved here.[5]

Regardless of the validity of the ITC's statutory arguments, we find them inapposite. The contention that a court would ultimately find Tenneco's information to be protected from disclosure under federal law does not address the issue of *how* the Commission will (or will not) seek to protect that information. Neither *Schreiber* nor *Owens*, the leading cases on agency discretion in releasing confidential information supplied by third parties, deals with the ultimate *substantive* law that protects the information in question; rather, both speak only to the relevant Commission *procedures* for disclosure of that information.

*Owens* in fact is quite clear about the distinction between the Commission's procedures and the underlying substantive law. One of Owens' entreaties at the appellate level was for an order requiring the FTC to determine, in advance of any request for information, whether the documents contained any trade secrets. We held this plea to be premature, reasoning that "[t]he Commission has promised to notify the affected appellant of any congressional request.... Thus, the appellants will be able to seek confidential treatment from the requestor itself...." 626 F.2d at 972. The *Owens* court realized that the question of appropriate Commission procedure regarding disclosure requests and the question of whether those requests would ultimately be granted by a court were two separate issues.

[regarding disclosure pursuant to Commission or court order of information submitted only by a *party* to an anti-dumping proceeding], information submitted to the administering authority or the Commission which is designated as proprietary by the person submitting it shall not be disclosed to any person (other than an officer or employee of the administering authority or the Commission who is directly concerned with carrying out the investigation in connection with which the information is submitted, or an officer or employee of the United States Customs Service who is directly involved in conducting an investigation regarding fraud under this subtitle) without the consent of the person submitting it.

4. FOIA exemption 3 includes "matters that are specifically exempted from disclosure by statute," and FOIA exemption 4 includes "matters that are trade secrets and commercial or financial information obtained from a person and privileged or confidential." 5 U.S.C. §§ 552(b)(3) & (4).

Tenneco attempts to shoot down the Commission's claims about FOIA exemptions 3 and 4 by referring to *Chrysler Corp. v. Brown*, 441 U.S. 281, 290–94, 99 S.Ct. 1705, 1711–13, 60 L.Ed.2d 208 (1979). Tenneco correctly argues that *Chrysler* holds that the FOIA exemptions do not foreclose disclosure at the option of the agency, but merely "demarcate[ ] the agency's *obligation* to disclose." *Id.* at 292, 99 S.Ct. at 1712 (emphasis added). We remind Tenneco, though, that both § 1677f(b), *supra* note 3, and the Trade Secrets Act, *infra* note 5, constitute independent checks on disclosure.

In any case, as we point out in the text, whether or not Tenneco's information is or is not protectable under some federal law is ultimately not what this case is about.

5. The Trade Secrets Act provides that

[w]hoever, being an officer or employee of the United States or of any department or agency thereof, or agent of the Department of Justice as defined in the Antitrust Civil Process Act (15 U.S.C. 1311–1314), publishes, divulges, discloses, or makes known in any manner or to any extent not authorized by law any information coming to him in the course of his employment or official duties or by reason of any examination or investigation made by, or return, report or record made to or filed with, such department or agency or officer or employee thereof, which information concerns or relates to the trade secrets, processes, operations, style of work, or apparatus, or to the identity, confidential statistical data, amount or source of any income, profits, losses, or expenditures of any person, firm, partnership, corporation, or association; or permits any income return or copy thereof or any book containing any abstract or particulars thereof to be seen or examined by any person except as provided by law; shall be fined not more than $1,000, or imprisoned not more than one year, or both; and shall be removed from office or employment.

18 U.S.C. § 1905.

The ITC also contends that the questionnaire itself promises that the responses will not be disclosed. This is true; it is also true that this promise excepts disclosure "as required by law." ITC Br. at 9 n. 10. Thus, whether or not the questionnaire representation is of any value depends in turn upon whether other laws are construed so as to require disclosure.

The ITC's second argument derives from its statement at the hearing below that its practice has been to oppose disclosure requests:

> [I]t has been the practice of the ITC to prohibit this information from being disclosed under (b)(3) and (b)(4), the exceptions to the [FOIA].
>
> We do not believe that [Tenneco's] information is discloseable. We take the strong position that this information is confidential information, and in the event that, either through the age of the documents or any other unforeseen circumstance, we would look at the information in the future and believe that it might not fall within the protection of the [FOIA], it has been the practice of the Secretary's office of the Commission to inform the parties that the information may not be subject to the protection of the [FOIA], and to allow those parties to act to protect that information.

Hear.Tr. at 4–5, Tenneco Br.App. at 27–28.

The Commission maintains that this in-court assertion, regarding its "practice" of either opposing disclosure or informing submitters if it has any intention of disclosing the information, constitutes a legitimate exercise of agency discretion falling "within permissible limits" under *Schreiber*. With due respect for the Commission's good faith in guarding confidential information, we do not think that its assurances during the hearing below—that it "has been the practice" to prohibit disclosure or to notify the relevant parties if it determines the information is not protectable— offer the same level of certainty as either a formal rule or published procedure like that involved in *Schreiber* or an explicit agreement like that involved in *Owens*.

*Schreiber* emphasizes that an agency is in a better position than a court to "design procedural rules adapted to the peculiarities of the industry and the tasks of the agency involved." 381 U.S. at 290, 85 S.Ct. at 1467. In order to give this degree of deference to an agency's choice regarding protection of information, though, we need to determine that the agency has indeed made a choice. *Schreiber's* deference, accordingly, is in the context of an established agency procedural rule. *Owens'* deference is to an explicit promise made to the party in question to provide notice a reasonable time prior to disclosing information. This vow, like the procedural rule in *Schreiber*, provides a significant measure of certainty regarding how the relevant agency will go about protecting information from disclosure.[6] Parties like Tenneco who harbor grave concerns about the ultimate safety of their information can rely on such rules and promises in planning how to protect their information. While *Schreiber* emphasizes the deference due an agency in choosing its own procedures for guarding confidentiality, we must remain cognizant of the correlative interests of the information-disclosers in knowing precisely how their materials will be protected.

In this case we do not find the Commission's averment that it has been its general practice to oppose disclosure or to notify the affected party otherwise to be the equivalent of a rule or explicit promise. It falls short of assuring the uneasy party how the Commission will proceed with regard to the specific information at issue. Accordingly, the District Court was justified in imposing the order requiring that the practice be followed *in this case*.

■ Our holding today is a limited one: given the circumstances of this case, *i.e.,*

---

**6.** Notice also permits the party whose information is subject to disclosure to litigate the matter itself. The law has often recognized a distinction between a party's opportunity to litigate its own interests and a party's being forced to rely upon the legal skills of others. *See, e.g.,* 1B J. Moore, J. Lucas, & T. Currier, Moore's Federal Practice ¶ 0.411(1), p. 388 (2d ed. 1984) ("Th[e] requirement that limits the binding effect of a judgment to parties and privies derives from the ancient principle that a person cannot be bound by a judgment unless he has had reasonable notice of the claim against him and an opportunity to be heard in opposition to that claim."); Fed.R.Evid. 804(b)(1) (excludes from hearsay rule "[t]estimony given as a witness at another hearing of the same or a different proceeding ... if the party against whom the testimony is now offered, or, in a civil action or proceeding, a predecessor in interest, had an opportunity and similar motive to develop the testimony by direct, cross, or redirect examination").

the Commission neither promised any form of notice, nor promised not to disclose the materials, nor acted pursuant to an established agency rule, but only alluded to a "practice" of either nondisclosure or notice, the ITC did not provide the appropriate degree of protection to material it admitted was ultimately nondisclosable under substantive law. It therefore failed to act "within permissible limits."

### D. *District Court's Reliance upon* GTE Sylvania

In issuing its protective order, the District Court did not rely upon the rationale we have set forth. Instead, it pointed out that the order would not impede the Commission's investigation, and then added that the order would grant additional protection to Tenneco in the event of a third-party request for its information. Here, the court cited *GTE Sylvania, Inc. v. Consumers Union of the United States, Inc.*, 445 U.S. 375, 100 S.Ct. 1194, 63 L.Ed.2d 467 (1980), for the proposition that "an agency which refuses to release documents because of a court injunction prohibiting release is not 'improperly' withholding agency records." Mem.Op. at 2, ITC Br.App. *GTE Sylvania* indeed holds that an agency is not improperly withholding records under 5 U.S.C. § 552(a)(4)(B) [7] if it is doing so to obey a federal district court injunction. However, the *GTE Sylvania* Court explicitly stated that it had no view on whether or not the underlying injunction should have issued, only that once it had issued, the agency had to abide by it. *Id.* at 387 n. 10, 100 S.Ct. at 1202 n. 10. The District Court, therefore, could not rely upon *GTE Sylvania* to support the appropriateness of the protective order itself.

It is clear, though, that we may affirm a district court on grounds other than those upon which it relied. *See Langnes v. Green*, 282 U.S. 531, 538–39, 51 S.Ct. 243, 246, 75 L.Ed. 520 (1931); *Molerio v. FBI*, 749 F.2d 815, 820 (D.C.Cir.1984). Accord-

ingly, for the reasons we have stated herein the judgment is

*Affirmed.*

---

**7.** 5 U.S.C. § 552(a)(4)(B) provides that "the district court ... has jurisdiction to enjoin the agency from withholding agency records and to order the production of any agency records improperly withheld from the complainant."